HEINRICH FREDERICK MEYER, APPELLEE, V. EMMA SCHMIDT
ET AL., APPELLANTS: DORA BANZHOF, CROSS-PETITIONER,
APPELLEE.

284 N. W. 337

FILED MARCH 3, 1939. No. 30476.

*McKillip & Barth* and *Erwin A. Jones,* for appellants.

*Harry L. Norval* and *Peterson & Devoe, contra.*

Heard before SIMMONS, C. J., EBERLY, PAINE, CARTER,
MESSMORE and JOHNSEN, JJ.

PAINE, J.

Plaintiff and cross-petitioner each secured decrees of
foreclosure. The defense was that the mortgagor, in con-
current mortgages given plaintiff and cross-petitioner, was
weak-minded in business matters, could not read English,
and executed the instruments through the undue influence
of her husband. The defendants appeal.

Plaintiff filed a petition to foreclose a mortgage on 120
acres of land in Seward county because of the default in
the payments due on two notes, one of $1,000 and one of
$2,750. The cross-petitioner, Dora Banzhof, also brought
action for the foreclosure of a similar mortgage for the de-

fault in payment of two notes for the same amounts, executed at the same time in the same transaction.

A single answer was filed to the petition and cross-petition, which answer includes a cross-petition, setting up many facts about the transactions between the various members of the family, and the line of descent, and setting out the homestead right of defendant Emma Schmidt in the property of her first husband, together with exhibit A, being a copy of the will of Diedrich Meyer, which will was witnessed by R. S. Norval, B. F. Norval, and Peter Goehner. This answer set out, as a defense to the mortgages, that defendant Emma Schmidt did not understand the nature of the transactions, or assent thereto, that she lacked the ability to comprehend, and that she signed her name to said instruments without knowing, or being advised of, her legal rights; that all the facts relating to the transaction were fraudulently withheld from said Emma Schmidt. The prayer of the cross-petition of Emma Schmidt and her husband is that, if the court finds that said instruments should not be canceled, then such instruments should be reformed so as to delete therefrom requirements for the payment of interest, and fix the due date at such time as Cajus Schmidt, husband of Emma Schmidt, finds himself able to make payments thereon, and that he be credited with the payment of $1,200 and given other relief. The replies thereto were general denials, together with specific denials that any fraud was at any time perpetrated upon the defendant Emma Schmidt.

It will thus be seen that the determination of the case rests primarily upon questions of fact rather than questions of law. The 200 pages of the bill of exceptions set out various family difficulties, and the private arrangements which were made to handle the real estate as some members of the family decided would be more equitable than as by the law provided.

The evidence of the defendants against the decree of foreclosure is largely based upon the incompetence and lack of mentality of Emma Schmidt. She testified that she was 52

years of age; that she was born in Ohio May 12, 1885. She testified that she came to Seward county when five years of age, and went to a parochial school every winter until she was 14 years of age. She told the studies which she took, and said she was pretty good in German. She testified that she married her first husband, Herman Meyer, November 10, 1915, and that he died May 22, 1916, and that she continued to live on the farm. She testified that she married her present husband, Cajus Schmidt, December 15, 1920. She said she did not know what a note was, nor could she write a check, and made a sorry attempt to write a check in court on the witness-stand, as well as an attempt to write down sums of money on a sheet of paper, and to add the sums dictated to her by her attorney. She admitted she took eggs to town for sale, but could only count them by sixes, it being claimed she can only count up to six. Upon direct and leading questions, she confessed she did not know what the papers were that she had signed at the Norval office, except that they were to "make settlement."

Only two questions were asked of her on cross-examination, bringing out the fact that whatever she did in Norval's office she did for her husband and at his request. Defense counsel claimed that it was clear from her evidence that she was not competent to contract by reason of her ignorance and weak understanding, and cites several Nebraska cases, *Meyer v. Fishburn*, 65 Neb. 626, 91 N. W. 534, *Wilson v. Bergmann*, 112 Neb. 145, 198 N. W. 671, and *Von Loh v. Graham*, 112 Neb. 306, 199 N. W. 553, which it is claimed are in point and support the proposition that contracts of a person of weak understanding will be set aside by the court when the conclusion can be drawn that deliberate judgment has not been exercised.

In the first of the three cases relied upon, we have a young man, 22 years of age, whose mental imbecility showed such a flagrant disregard of his own interests as challenged a strict examination of his contracts, and an experienced banker gained his confidence, and assisted him in making business deals, in each of which the young man lost out.

In the case of *Wilson v. Bergmann, supra,* it appears that Bergmann was 23 years old, had little education, could read with difficulty, and his perceptions were dull; his father said he paid two prices for everything he bought. In this land deal, an agent took him off by himself, and through fraud, artifice, and cunning, unduly influenced him to trade off his 80 acres of land, which his father had given him, for a piece of land of less value.

In the third case, Arthur Von Loh, incompetent, brought action by his guardian to recover a balance due in an adjustment of their mutual accounts.

We do not believe that the facts in any of these three cases are near enough in point with the facts in the case at bar to entitle the holdings therein to be accepted as precedents in this case.

It may be pointed out that the only evidence that Emma Schmidt was mentally incompetent was given by herself and her husband; that for over 45 years she had mingled with her neighbors, and done such business in selling produce as is customary for a farmer's wife. In addition to this, the evidence shows that, when her first husband died, she was appointed by the probate court of Seward county to have charge of administering his estate; that as administratrix she filed the necessary reports, which were approved, settled, and allowed.

The testimony of Attorney R. S. Norval as to the entire transaction in reference to the deed and two mortgages is given in the greatest detail. His recitation of his recollection of the conversations of each of the parties is so complete and satisfactory as to tend to explain away all inferences of incompetence and fraud charged in the case at bar.

The evidence of the attorney who prepared the deed alleged to have been obtained by undue influence exerted by the grantee, that the deed was executed by the grantor understandingly and voluntarily, cannot ordinarily be overcome by evidence relating to different occasions. *Little v. Curson,* 114 Neb. 752, 209 N. W. 737.

It is also charged in this case that Emma Schmidt signed the deed and mortgages by reason of the undue influence exercised upon her by her husband. "Undue influence" may be defined as follows: "Where one party is under the domination of another, or by virtue of the relation between them is justified in assuming that the other party will not act in a manner inconsistent with his welfare, a transaction induced by unfair persuasion of the latter, is induced by undue influence and is voidable." 2 Restatement, Contracts, 954, sec. 497.

When we consider this accurate definition of undue influence, it is clear that the husband did not act, or advise his wife to act, in a manner inconsistent with good business judgment, as conditions were in 1925. Therefore, there was no such undue influence exercised by him which requires the instruments they signed to be declared void.

"There is no fraud where there is nothing wrong, and fraud cannot be deduced or inferred from that which the law pronounces honest." 12 R. C. L. 237, sec. 8.

Mental incapacity to avoid a deed must be such that the grantor was so weak and unbalanced that he did not understand and comprehend the purport of what he was doing. *West v. West*, 84 Neb. 169, 120 N. W. 925; *Schley v. Horan*, 82 Neb. 704, 118 N. W. 659; *Hacker v. Hoover*, 89 Neb. 317, 131 N. W. 734; *Keedick v. Brogan*, 116 Neb. 339, 217 N. W. 583; *Broeker v. Day*, 124 Neb. 316, 246 N. W. 490.

The mere fact that a person is unlearned, and ignorant of legal proceedings, affords no ground for relief in equity, unless the person against whom relief is sought misrepresented the facts to him. 12 R. C. L. 235, sec. 6.

A memorandum opinion, signed by the trial judge, is found in the record, setting out the evidence and his conclusions thereon. Here is a paragraph therefrom:

"Cajus Schmidt, the husband of Emma Schmidt, pleads and proves that he spoke for his wife and acted for her, though she was present and fully understood what was being done. Emma Schmidt while not highly educated is

a wholesome pioneer type of woman, with good alert mental capacity for her station of life. She understood the pleadings she signed when explained and read to her by her counsel, and the evidence, coupled with her appearance and demeanor, convinced the court that she understood fully and agreed to the sale and executed the notes and mortgages as consummated on December 11, 1925. She also understood and concedes that the mortgage and note of January 30, 1931, are valid, binding obligations, in default and subject to final decree of foreclosure."

And, again, the trial judge says: "Nowhere in the evidence can we find anything to sustain the defense of mistake, or require reformation. Neither does the evidence show any fraud, either constructive or actual. The facts are simply that the Schmidts made a purchase in good faith at the time it was made. Under the conditions existing December 11, 1925, their bargain was a good one in every respect."

It is known to all that the unfortunate depression and repeated drouths have reduced all farm values in Nebraska to but a fraction of the values prior thereto.

"When the testimony of the witnesses· upon the vital question involved is conflicting, this court will, while trying the case *de novo*, consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the other." *Southern Surety Co. v. Parmely*, 121 Neb. 146, 236 N. W. 178. See, also, *Johnson v. Erickson*, 110 Neb. 511, 194 N. W. 670; *Krelle v. Bowen*, 128 Neb. 418, 259 N. W. 48; *Turpin v. State, ante*, p. 389, 281 N. W. 800.

The fact that a deed and mortgages are drawn by an experienced attorney, when all of the interested parties are present, and the proposed settlement between them is deliberately discussed from every angle, and when it is admitted on all hands that the husband of the wife who is claimed to be mentally deficient was a man who was experienced in business matters and understood fully what was being done, and had advised his wife, who was 40 years of

age at the time, to sign the papers, which he joined her in executing, together with the fact that the disposition made would have been, in times of continued prosperity, of advantage to the husband and wife, does not, in the opinion of the court, justify granting the relief sought, even though, after years of continued depression and drouth, the entry of these decrees of foreclosure at this time proves to be very unfortunate.

A careful reading of the record in this case does not support the claim of incompetence on the part of the wife, or the charge of any fraud or overreaching in the execution of the instruments in this case, and the decree of the trial court is hereby

AFFIRMED.