HELEN M. SCHROEDER, APPELLEE, V. HAROLD ELY ET AL.,
APPELLANTS.

73 N. W. 2d 165

Filed November 18, 1955.   No. 33716.

*E. Merle McDermott* and *Cunningham & Cunningham,* for appellants.

*A. G. Abbott,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is an appeal from the district court for Hall County by Harold and Faye Ely, defendants below, from a judgment against them and in favor of Helen M. Schroeder, plaintiff below, for the sum of $56,055 with interest at 6 percent from June 25, 1954, and costs.

Appellee sued appellants for an accounting of all money she had advanced to them under and in pursuance of an alleged oral agreement she claims was entered into by the parties hereto in July 1947. Under the terms of the agreement she alleged she agreed to loan appellants the necessary money to construct and equip a motel on condition that appellee would have a home with appellants as one of the family for the balance of her life. The basis for the action is the claim that appellee was forced to leave the home of appellants on July 30, 1953. In addition to granting appellee a judgment for the amount hereinbefore set forth the court, pursuant to appellee's prayer therefor, granted her an equitable lien on the motel property, both real and personal, for the full amount it found she was entitled to. This appeal was taken by the appellants after their motion for a new trial had been overruled.

For convenience we shall herein refer to the appellants as the Elys or by their individual names of Harold Ely and Faye Ely.

The action, being equitable in character, is considered here de novo. In view of the evidence adduced by the parties on some material questions of fact, the following

principle has application: "Actions in equity, on appeal to this court, are triable de novo * * * subject, however, to the rule that when the evidence on material questions of fact is in irreconcilable conflict this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the opposite." Sopcich v. Tangeman, 153 Neb. 506, 45 N. W. 2d 478. See, also, Smith v. Black, 143 Neb. 244, 9 N. W. 2d 193.

The principal question raised by this appeal is whether or not the evidence sustains the judgment. Involved in that issue is whether or not the written compromise settlement executed by the parties on September 17, 1953, after this litigation was begun on September 10, 1953, should be upheld. Involved in the latter issue is the question of whether or not appellee, by her conduct, is now estopped to deny the compromise settlement.

Appellee, at the time of trial in June 1954, was 63 years of age. She was born in Dennison, Iowa, and came to Hall County, Nebraska, in 1895 with her parents. She was educated in the rural schools of Hall County, attending school to the eighth grade. Appellee never married and has spent most of her life doing housework for others. On Christmas day of 1942 she became acquainted with the Elys at the home of mutual friends.

The Elys, who are husband and wife, were, insofar as the record shows, respectively 50 and 66 years of age at the time of trial. They were married in 1940 and came to Nebraska and Hall County sometime in 1942. Their coming resulted from his employment with a contractor who was engaged in helping to construct the Cornhusker Ordnance Plant.

In December 1944 the Elys bought an improved 18-acre tract of land south of Grand Island located on South Locust Street at the intersection of U. S. Highways Nos. 34 and 281. They immediately moved onto the premises and thereafter engaged in the business of buy-

ing or raising chickens, ducks, and rabbits, dressing them, and then selling the dressed product. They also raised and sold dogs. The property was equipped for this business. In June 1947 appellee came to their place and started working on a part-time basis, working about 2 days a week. At that time she lived in her own home located at 1420 West Louise Street in Grand Island.

Appellee had always worked for a very modest wage. She was one of two children, having a brother by the name of Peter. She had inherited a great deal of property from her relatives, particularly her parents and grandparents. Her inheritance included interests in farms in Story, Madison, and Crawford Counties, Iowa, as well as substantial amounts of other personal property, including cash. While the evidence shows she had had very little business experience it appears she was extremely frugal and had saved the money she earned and the property she inherited.

Sometime during July 1947, while she was at the Elys' home, the Elys mentioned that they planned to start building a motel by constructing two cabins out of some used lumber they had on hand. Appellee at that time suggested to the Elys that she had plenty of money and they could use it to build a good motel. Out of this discussion an agreement was entered into whereby appellee was to advance the money necessary to build a motel and in return she was to have a home with the Elys for the rest of her life, the Elys to repay the money so advanced but not to pay interest for its use.

Under this arrangement appellee advanced substantial amounts of money, disposing of considerable of her real and personal property to do so. She advanced sufficient money to build a 13-unit modern motel. The building of this motel was started about August 26, 1947, and, for all practical purposes, was completed in July 1949. After this arrangement had been agreed upon appellee sold her home in Grand Island, the contract being dated July 29, 1947, and moved out to stay with the Elys.

For over 4 years everything worked out well although the parties had some differences. The first serious difficulty occurred when, on January 28, 1952, appellee was forced to leave the Ely home because of the conduct of Faye Ely. However, within about a month, a reconciliation was had and she moved back. Everything again seemed to run smoothly until July 30, 1953, when appellee was again forced to leave the Ely home because of the conduct of Faye Ely. We find the Elys failed to carry out their obligation to provide a home for appellee for the balance of her lifetime and that she left their home for good cause because the conduct of Faye Ely made it impossible for appellee to live with them and, because thereof, appellee was entitled to bring this action and to have an accounting of the money she had advanced and judgment therefor. See McCoy v. Cunningham, 141 Neb. 708, 4 N. W. 2d 835.

The evidence shows she advanced in excess of the amount for which judgment was rendered. Appellee testified that in July 1953 Harold Ely admitted he owed her about $84,000. We think that amount is about correct if the $7,000 appellee advanced for the purchase of 14 acres is included. However, that loan will be more fully discussed hereinafter and should not be included in the accounting herein sought. Suffice to say the evidence would entitle the appellee to a much larger judgment than she has obtained, but since she took no cross-appeal that question is not here.

This action was started on September 10, 1953, and the Elys were served on the same day. In her original petition appellee asked to recover the sum of $35,000. When she started this suit she did not know how much money she had advanced to the Elys as she had kept no account thereof, depending on Mr. Ely to do so. Her attorney had not then had time to check her accounts to ascertain the amount advanced. It appears from an ad in a Grand Island paper dated September 1, 1953, that the Elys were endeavoring to sell the motel prop-

erty. Appellee's counsel advised immediate suit in order to prevent the Elys from consummating a sale and leaving the community with the proceeds. Consequently the action was immediately started and the figure of $35,000 used although later, after a check of appellee's accounts had been made, an amended petition was filed on January 16, 1954, asking for the sum of $86,403.88.

Very shortly after the action was started Harold Ely and appellee entered into a settlement agreement dated September 17, 1953. Under the terms of the agreement appellee was to be paid in full the $7,000 mortgage which she held on the 14-acre tract of land purchased by the Elys in 1950, to be paid $32,000 which was to be secured by a mortgage on the motel property, and to be paid the amount she had paid in the spring of 1953 for furniture used in the motel. In addition the agreement provided the Elys were to continuously list the motel for sale. The evidence establishes that Harold Ely induced appellee to sign the settlement on the basis that it would put her back in the financial condition she was in when she came out to their place in 1947 before she had advanced any money to build the motel.

"Where parties capable of entering into a contract enter into an agreement whereby the one agrees to pay, and the other to accept, a certain sum in full satisfaction and discharge of a disputed claim urged by the latter against the former, such agreement constitutes a valid contract between the parties." Massillon Engine & Thresher Co. v. Prouty, 65 Neb. 496, 91 N. W. 384.

Where a compromise is pleaded and proved, in the absence of fraud, mistake, or duress, it is binding on the parties. In order to avoid the effect of such a compromise settlement it is necessary to plead and prove fraud, mistake, or duress which resulted in an unconscionable settlement. See Springfield Fire & Marine Ins. Co. v. Peterson, 93 Neb. 446, 140 N. W. 760. Appellee so pleaded in her reply.

While appellee contends otherwise we think the par-

ties, at the time they entered into the original agreement, dealt at arms length and fully· understood the terms thereof. However, after appellee became a member of the Ely family in September 1947 a confidential relationship developed, especially between appellee and Harold Ely. She developed such complete confidence in Harold Ely that she consulted no one else about her business affairs and let him take care of them. In fact, at the Elys' suggestion, she told no one what she was doing. When he advised her in regard to any business matter the evidence shows she trusted him, relied on his advice, and always followed it to the extent that she kept no account of the money advanced, depending on him to do so as he had told her he would. This he failed to do. This confidence in him she never lost even though it was no longer possible for her to stay in the Ely home because of the conduct of Faye Ely. Incidentally Faye Ely was visiting in Texas at the time the settlement was entered into. With this background it is understandable how appellee accepted Harold Ely's figures to show the agreement would restore her to her 1947 financial condition when, in fact, it would not return even half the money she had advanced.

As early as Columbus Co. v. Hurford, 1·Neb. 146, we said: "It is the duty of persons holding confidential relations, of whatever nature, with others, to put themselves on terms of perfect equality, by furnishing full, exact and truthful information of all matters which enter into a negotiation between them."

"The rule as to confidential or fiduciary relations applies to any transaction or situation of advantage, in which confidence is rightfully reposed on one side and a resulting superiority and opportunity for influence is thereby created on the other. In any such case where confidence is known, or may reasonably be expected, to exist as a fact, whether it is of a legal, moral, social, domestic or personal character, equity will scrutinize the transaction critically—and especially so where·

age, infirmity and instability are involved—to see that no inequitable action has been taken and no injustice has occurred. Its purpose is not merely to satisfy itself of absence of pressure or influence, but to be certain that the fullest and fairest explanation possible has been made, and that complete knowledge, understanding, intention, consent and freedom of action duly existed." Stieber v. Vanderlip, 136 Neb. 862, 287 N. W. 773.

A reasonable summary of the value of the property she owned at the time she went to live with the Elys, under the arrangements made as hereinbefore set forth, indicates a total of approximately $124,000 whereas when she left there in July 1953 it would total about $57,700 or a difference of $66,300. Deducting from this the $7,000 used to buy the 14-acre tract leaves a total of $59,300 as compared with the $32,000 the settlement agreement would give her. This does not include any income she received as rents, interest, or dividends during the years from 1947 to 1953, which was substantial. Considering the confidential relationship of the parties at the time this settlement agreement was entered into we thing Harold Ely overreached the appellee when he induced her to sign it on September 17, 1953, and it would be unconscionable to enforce it. As stated in Wilson v. Bergmann, 112 Neb. 145, 198 N. W. 671, and cited with approval in Cunningham v. Brewer, 144 Neb. 211, 13 N. W. 2d 113: "* * * when the contract is of such a nature as to justify the conclusion that a party has been imposed upon by cunning, artifice, or undue influence, a court of equity will not hestitate to set the contract aside." Appellee is entitled to have the compromise agreement set aside as the trial court decreed.

Did an estoppel arise by reason of what transpired subsequent to the settlement agreement of September 17, 1953, which would prevent appellee from repudiating that agreement? The Elys contend they partially performed it and that appellee accepted the benefits of their partial performance and is now estopped to deny the

effect of the compromise agreement and is bound thereby.

The rule here applicable is stated in Brisbin v. E. L. Oliver Lodge No. 335, 134 Neb. 517, 279 N. W. 277: "In 10 R. C. L. 694, sec. 22, it is stated: 'The doctrine of equitable estoppel is frequently applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced or of which he has accepted any benefit. * * * And so also the acceptance of any benefit from a transaction or contract, with knowledge or notice of the facts and rights, will create an estoppel.' "

The Elys testified that after September 17, 1953, they continuously listed the motel property for sale as the settlement provided. This was not done with appellee's approval because, on September 18, 1953, Harold Ely was informed that appellee did not intend to carry out the agreement and was given the reasons for her not being willing to do so. Consequently he could not create an estoppel, as far as appellee is concerned, by endeavoring to carry out the contract unless she knowingly received and accepted some material benefit by reason thereof. Such is not the fact.

As to the $32,000 note and mortgage it was tendered to appellee at the trial but not accepted.

Finally we come to a consideration of the mortgage referred to in the agreement which is on a 14-acre piece of bare land. The Elys bought this land in 1950 to prevent the possibility of a motel being built thereon as it is situated in the immediate neighborhood. The purchase price was $7,000 which appellee advanced and for which it was then understood she was to have and was given a mortgage. The original description in the mortgage was for 11.9 acres. That is the reason, when appellee sought the foreclosure thereof, she also sought a reformation of the description to cover the 14 acres that were purchased. It appears the correction was made by giving a new mortgage and the foreclosure dismissed.

In regard to the settlement agreement, as it relates to this obligation, Harold Ely agreed to do and did nothing he was not already legally obligated to do.

A careful consideration of all the facts convinces us that appellee did nothing nor did she receive any benefit therefrom that would now estop her from having the settlement agreement vacated and set aside.

There is one further factual matter which we will consider. However, considering the amount of the judgment, it is not too material. On January 1, 1951, appellee turned over to Harold Ely an envelope containing nine cancelled checks evidencing $15,250 of the amount she had advanced to the Elys under and in pursuance of the contract originally entered into. On this envelope she had written "Paid in Full Happy New Year from Helen 1951." It is clear from the evidence that appellee did not thereby intend to cancel that amount of the loan which the Elys then owed her but rather for the purpose of having him keep the checks for her and to show the Elys she would not press them for payment. It is evident that Harold Ely so understood it and always intended to pay appellee the amount thereof. At most it was a gift on condition that she have a home with them for life. That, as we have already said, became impossible because of the conduct of Faye Ely.

As said in Williamson v. Johnson, 62 Vt. 378, 20 A. 279, 9 L. R. A. 277, 22 Am. S. R. 117: "* * * the gifts were not absolute, but conditional, and * * * when the condition failed a right of action accrued to the plaintiff to recover the money."

Although the evidence adduced does not disclose the parties expressly agreed the appellee should have a lien on the motel property, both real and personal, for all money advanced the trial court's decree so provided. It provides: "* * * plaintiff be and she is awarded an equitable lien on the premises hereinbefore described owned by defendants in joint tenancy with the fixtures thereon and the equipment, utensils, appliances, utensils

and paraphernalia pertaining to the motel, restaurant, filling station and gift shop and the chattels hereinbefore referred to: * * *."

"An equitable lien is a right, not recognized at law, to have a fund or specific property, or its proceeds, applied in whole or in part to the payment of a particular debt or class of debts. It is not an estate or property in the thing itself, nor is it a right to recover the thing, that is, it is not a right which may be the basis of a possessory action, but it is merely a charge upon it. Such a lien may be created by an express contract which shows an intention to charge some particular property with a debt or obligation, or it may arise by implication from the relations and dealings of the parties whose interests are involved." 33 Am. Jur., Liens, § 18, p. 427.

As stated in 33 Am. Jur., Liens, § 21, p. 430: "In the absence of an express contract, a lien based upon the fundamental maxims of equity may be implied and declared by a court of equity out of general considerations of right and justice as applied to the relationship of the parties and the circumstances of their dealing." See, also, Hilton v. Clements, 137 Neb. 791, 291 N. W. 483; 53 C. J. S., Liens, § 4, p. 844.

Having come to the conclusions hereinbefore set forth, we affirm the decree of the trial court.

AFFIRMED.